1   **DAVID J. STEELE, CA Bar No. 209797**
    **Email:  djslit@cph.com**
2   **CHRISTIE, PARKER & HALE, LLP**
    **18101 Von Karman Ave., Suite 1950**
3   **Irvine, CA 92612-0163**
    **Telephone: (949) 476-0757**
4   **Facsimile:  (949) 476-8640**

5   **HOWARD A. KROLL, CA Bar No. 100981**
    **Email:  howard.kroll@cph.com**
6   **CHRISTIE, PARKER & HALE, LLP**
    **350 W. Colorado Boulevard, Suite 500**
7   **Pasadena, CA  91105**
    **Telephone: (626) 795-9900**
8   **Facsimile:  (626) 577-8800**

9   Attorneys for Plaintiffs
    VERIZON CALIFORNIA INC.
10  VERIZON TRADEMARK SERVICES LLC
    VERIZON LICENSING COMPANY,

11

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14              WESTERN DIVISION

15

16  VERIZON CALIFORNIA INC.;          Case No. CV 11-00973 ABC (CWx)
    VERIZON TRADEMARK
    SERVICES LLC; and VERIZON
17  LICENSING COMPANY,               **PLAINTIFFS' MEMORANDUM**
                                      **OF POINTS AND AUTHORITIES**
18           Plaintiffs,             **IN OPPOSITION TO MOTION**
                                      **OF DEFENDANTS ABOVE.COM**
19        vs.                        **PTY LTD, TRELLIAN LIMITED,**
                                      **TRELLIAN LLC, AND DAVID**
20  ABOVE.COM PTY LTD; TRELLIAN       **AND RENE WARMUZ FOR**
    LIMITED; TRELLIAN LLC; DAVID      **PARTIAL DISMISSAL UNDER**
21  WARMUZ; RENE WARMUZ a/k/a         **FED. R. CIV. P. 12(b)(6)**
    REN WARMUZ; and DOES 1-10,
22
             Defendants.             Date:   July 18, 2011
23                                    Time:  10:00 a.m.
                                      Ctrm:  680
24
                                      Hon. Audrey B. Collins
25

26

27

28

CHRISTIE, PARKER & HALE, LLP

1

## <u>TABLE OF CONTENTS</u>

2
<u>Page</u>

3    I.    INTRODUCTION ................................................................................ 1

4    II.   FACTUAL BACKGROUND ............................................................... 2

5    III.  ARGUMENT ...................................................................................... 6

6          A.   There Is a Claim for Contributory Cybersquatting As the
               Defendants' Own Authorities Confirm. ................................... 6

7

8          B.   Because the Cybersquatting Tort Is a Statutory Extension of
               Trademark Infringement to a New Factual Context,
               Contributory Liability Applies and Derives Its Elements from

9               Contributory Trademark Infringement. .................................... 8

10         C.   Plaintiffs Have Properly Stated a Claim for Contributory
               Cybersquatting. ...................................................................... 12

11

12         D.   Defendants Policy Arguments Ignore The Reasons For
               Contributory Liability. ........................................................... 17

13   IV.   CONCLUSION ................................................................................ 17

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CHRISTIE, PARKER & HALE, LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

### CASES

*Bob Jones University v. United States*,
    461 U.S. 574 (1983) ..................................................................... 12

*DSPT International, v. Nahum*,
    624 F.3d 1213 (9th Cir. Oct. 27, 2010).............................. 4, 11, 12

*Ford Motor Co. v. GreatDomains.com, Inc.*,
    177 F. Supp. 2d 635 (E.D. Mich. 2001)................... 6, 7, 8, 12, 13, 15, 16, 17

*Grant Airmass Corp. v. Gaymar Industrial, Inc.*,
    645 F. Supp. 1507 (S.D.N.Y. 1986)....................................... 11

*Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.*,
    955 F.2d 1143 (7th Cir. 1992)........................................... 12, 13, 17

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*,
    456 U.S. 844 (1982) ........................................... 7, 8, 12, 15

*Lockheed Martin Corp. v. Network Solutions, Inc.*,
    194 F.3d 980 (9th Cir. 1999)............................................ 7, 13, 15

*Louis Vuitton S.A. v. Lee*,
    875 F.2d 584 (7th Cir. 1989).............................................. 13, 17

*Meyer v. Holley*,
    537 U.S. 280 (2003) ..................................................................... 8

*Microsoft Corp. v. Shah*,
    2011 U.S. Dist. LEXIS 2995, 98 U.S.P.Q. 2d (BNA) 1404
    (W.D. Wash. Jan. 12, 2011) ........................................ 1, 7, 8, 11, 12

*Solid Host, NL v. Namecheap, Inc.*,
    652 F. Supp. 2d 1092 (C.D. Cal. 2009) .......................... 7, 8, 10, 12, 13, 15

*Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*,
    202 F.3d 489 (2d Cir. 2000)........................................................ 10

*United States v. Texas*,
    507 U.S. 529 (1993) ..................................................................... 8

*Yankee Publication Inc. v. News America Publication Inc.*,
    809 F. Supp. 267 (S.D.N.Y. 1992)............................................... 10

1

## STATUTES

2  15 U.S.C. § 1125 ..................................................................................... 6

3  15 U.S.C. § 1125(d)(1) ...................................................................... 1, 9

4  15 U.S.C. § 1125(d)(1)(A) ................................................................. 4

5

## RULES

6
FED. R. CIV. P. 12(b)(6)...................................................................... 1, 17

7

8

## OTHER AUTHORITIES

9  106 S. Rpt. 140 (1999)............................................................................ 9

10  145 Cong. Rec. S9744-9755 (daily ed. Aug. 5, 1999) ............................. 9

11  145 Cong. Rec. S10513-10520 (daily ed. Aug. 5, 1999) ........................ 9

12  *Association des Centres Distributeurs E.Leclerc - A.C.D Lec v.*
     *Ho Nim / Above.com Domain Privacy*, D2011-0070,
13     (WIPO Mar. 14, 2011) ..................................................... 16

14  CALLMANN ON UNFAIR COMPETITION, TRADEMARKS
     AND MONOPOLIES (4th ed., upd. 2010) ........................................ 11

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Plaintiffs Verizon California Inc., Verizon Trademark Services LLC, and
2  Verizon Licensing Company (collectively, "Plaintiffs") oppose the Motion of
3  Defendants Above.com Pty Ltd, Trellian Limited, Trellian LLC, and David and
4  Rene Warmuz (collectively, "Defendants") for Partial Dismissal Under Fed. R.
5  Civ. P. 12(b)(6) ("Motion to Dismiss") as follows:

6  **I.    INTRODUCTION**

7  Defendants are serial cybersquatters who operate a massive cybersquatting
8  operation.   In addition to their own cybersquatting efforts, Defendants also
9  provide services used by Defendants' customers to cybersquat.   Defendants
10  know, or should know, that the services Defendants provide are being used by
11  their customers to cybersquat. Notwithstanding Defendants' knowledge,
12  Defendants continue to provide the services to their customers.  Plaintiffs filed
13  their Complaint against Defendants and allege both direct cybersquatting and
14  contributory cybersquatting.  Defendants now move to dismiss the contributory
15  cybersquatting claim based on their incorrect view that there is no such claim.

16  Defendants cannot overcome the overwhelming fact that every court that
17  has reviewed whether a claim for contributory cybersquatting exists has clearly
18  recognized that it does.  Remarkably, in one of the cases cited by Defendants,
19  Defendants'  counsel  unsuccessfully  moved  to  dismiss  a  contributory
20  cybersquatting claim, raising essentially the same unpersuasive arguments now
21  raised in Defendants' Motion to Dismiss.[1]  For the same reasons each of prior
22  courts upheld a claim for contributory cybersquatting, Defendants' Motion to
23  Dismiss should be denied.

24
25  [1] *See Microsoft Corp. v. Shah*, No. 10-cv-00653-RSM (W.D. Wash. April 15,
26  2010).  *See* Doc. No. 19, *Defendants' Amended Motion To Dismiss Under Fed. R.
    Civ. P. 12(b)(6)*; Doc. No. 29, *Order Denying Defendants Amended Motion to
27  Dismiss*, reported at 2011 U.S. Dist. LEXIS 2995, 98 U.S.P.Q.2d (BNA) 1404
28  (W.D. Wash. Jan. 12, 2011)

CHRISTIE, PARKER & HALE, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.    **FACTUAL BACKGROUND**

Defendants are serial cybersquatters who operate a massive cybersquatting operation and have registered and used hundreds of thousands of domain names for commercial exploitation. Complaint, ¶ 39.  Defendants have registered many of these domain names for their own use, *i.e.* Defendants, or one of their *alter egos* or aliases, is the registrant of these domain names. Complaint, ¶ 39, 50, 56. Many of Defendants' domain names are confusingly similar to the world's most well-known trademarks.  Complaint, ¶ 71, Exhibit 6 to the Complaint.  Examples of some of the famous trademarks that Defendants have cybersquatted on include: ABERCROMBIE AND FITCH, BARBIE, CARTOON NETWORK, DISNEY, EHARMONY, FISHER PRICE, GOOGLE, HARLEY, IPHONE, J.C. PENNEY, KELLY BLUE BOOK, LOUIS VUITTON, MAPQUEST, NOKIA, OLD NAVY, POKEMON, QUIKSILVER, RADISSON HOTELS, SONY, TOYOTA, UNITED AIRLINES, the VERIZON Marks, WALMART, XM RADIO, YAHOO and ZILLOW.  Exhibit 6 to the Complaint.  In fact, Defendants' portfolio of domain names is so infested with domain names that infringe famous trademarks that the representative list[2] filed in support of Plaintiffs' Complaint is *many* pages long, single-spaced, with dual columns (the "Confusingly Similar Domain Names").  Exhibit 6 to the Complaint.  Over 183 of the Confusingly Similar Domain Names infringe Plaintiffs' famous VERIZON trademarks and service marks (the "Infringing Domain Names").  Complaint, ¶ 78.

Defendants use the Confusingly Similar Domain Names to lure Internet users searching for genuine websites associated with those famous or distinctive trademarks.  Complaint, ¶ 40.  The websites hosted at most of the Confusingly Similar Domain Names display links featuring goods or services directly competitive with those sold or provided in connection with the famous or

---

[2]   This representative list, attached as Exhibit 6 to the Complaint, only included the infringing domain names for one famous mark for each letter of the alphabet.

distinctive trademarks.   Complaint, ¶ 41.   Advertisers, search engines, and affiliate programs make payment each time an advertisement is displayed or a link is clicked on that domain name.  Complaint, ¶ 40.

The Defendants use a number of shell companies, false identities, and its own so-called "privacy service" for the improper purpose of concealing their true identities and their involvement in the registration of, use of, or trafficking in Confusingly Similar Domain Names.   Complaint, ¶¶ 46-50, 64-65.   These shell companies, false identities, or the so-called privacy service, were listed as the registrant within the WHOIS records for the Confusingly Similar Domain Names, including the Infringing Domain Names.  Complaint, ¶ 64.  Plaintiffs list several of these entities (those Plaintiffs were aware of at the time of filing) in its Complaint, including: Above.com Domain Privacy, Domain Technician, Mark Segal, Domain Park Limited, Galacaus Inc., Swallowlane Holdings Ltd, Transure Enterprise Ltd, Trellian and Trellian Software (collectively, the "False Identities"). Complaint, ¶ 46.

In addition to Defendants' direct cybersquatting, Defendants also operate three separate businesses which are used both by Defendants and Defendants' customers in connection with the registration, use, and trafficking in the Confusingly Similar Domain Names, including the Infringing Domain Names. Complaint,  ¶ 56, 64,  and 68.   These businesses include: First, Defendants' registrar business, Above.com Pty Ltd., which operates using the above.com domain name.  Complaint, ¶ 56.  This registrar business needs little explanation; Above.com Pty Ltd registers domain names for Defendants' own use and for Defendants' customers. Complaint, ¶ 56, and Exhibit 7 to the Complaint.

Second, Defendants provide a so-called privacy service which has operated under a number of names, including at least: Above.com Domain Privacy, Domain Park Limited, and Transure Enterprise Ltd, and has also at times used the above.com domain name.  Complaint, ¶ 64, and Exhibits 7 & 9 to the Complaint.

1   Defendants' so-called privacy business is used to obscure the true identity of a
2   domain name's owner. Complaint, ¶ 65.  The privacy service is used to obscure
3   the true identity of both the Defendants, and Defendants' customers. Complaint,
4   ¶¶ 65, 111.

5       Lastly, Defendants' provide a monetization service which has operated
6   under the name Trellian LTD, and uses the trellian.com domain name. Complaint,
7   ¶¶ 68, 114.   Defendants' monetization services is commonly referred to as
8   "Domain Parking Manager," and is offered by Defendants' in connection with
9   Above.com Pty Ltd's registrar business.  Complaint, ¶ 116.  One key aspect of
10  Defendants' Domain Parking Manager is to maximize the money paid to domain
11  name owners who host webpages which contain advertisements. Complaint,
12  ¶¶ 41, 44; *see Domain Parking Manager*, available at www.above.com.

13      The Anti-Cybersquatting Consumer Protection Act ("ACPA") creates
14  liability for certain forms of cyberpiracy. Under the ACPA, a plaintiff must show
15  that "(1) the defendant registered, trafficked in, or used a domain name; (2) the
16  domain name is identical or confusingly similar to a protected mark owned by the
17  plaintiff; and (3) the defendant acted with 'bad faith intent to profit from that
18  mark.'" *DSPT International, v. Nahum*, 624 F.3d 1213, 1224 at fn. 10 (9th Cir.
19  2010); 15 U.S.C. § 1125(d)(1)(A). There is no dispute that the Plaintiffs have
20  adequately alleged, for purposes of moving forward to discovery, that Defendants
21  registered, trafficked in, and used at least 183 domain names that are confusingly
22  similar   to   the   distinctive   VERIZON   marks   (including   names   such   as
23  veri8zon.com and vewrizonwireless.com).  There is also no dispute that Plaintiffs
24  have adequately alleged facts indicating Defendants bad faith intent to profit from
25  these activities.

26      Plaintiffs have also alleged that Defendants use the Above.com privacy
27  service to conceal their true identities and their involvement in cybersquatting.
28  Similarly, Plaintiffs have alleged that Defendants use the Trellian monetization

service in connection with their cybersquatting.

Significant to the Motion to Dismiss, Plaintiffs have also alleged that Defendants provide the Above.com privacy service and Trellian monetization service to Defendants' customers who have registered or used domain names that are confusingly similar to the distinctive VERIZON marks. Complaint, ¶¶ 111, 116. Plaintiffs have also alleged that Defendants are able to monitor the use of, and have control over, the Above.com privacy service and Trellian monetization service they provide. Complaint, ¶¶ 112, 117. Further, Plaintiffs have alleged that Defendants are aware that these services are used by Defendants' customers to infringe the rights of others, including Plaintiffs' rights. Complaint, ¶¶ 114, 119. Notwithstanding Defendants' knowledge that their services are being used for an unlawful purpose, and that Defendants' have control over these services, Plaintiffs allege that Defendants continue to supply the services to Defendants' customers. Complaint, ¶¶ 115, 120. Each of the above allegations is plainly stated in Plaintiffs' Complaint, along with adequate detail of the factual circumstances in which they occurred in both the Complaint and the Exhibits to the Complaint.

The only question raised by the Motion to Dismiss is whether the Defendants are also liable for contributing to the cybersquatting by Defendants' customers by continuing to provide the Above.com privacy service and Trellian monetization service, even after Defendants knew, or should have known, that these services were used to infringe the rights of others, including Plaintiffs' rights.

Defendants incorrectly argue that there simply is no such tort as contributory cybersquatting, based on their incorrect construction of the ACPA and contrary to the very legal authority they cite to support their argument. Nor do Defendants offer a single argument about how the goals of the Lanham Act or ACPA or the interests of the public would be served by the Court's refusal to

1    recognize such liability.

2        Case authority governing the construction of statutes, in compliment with

3    an existing common law background, compels the conclusion that contributory

4    trademark infringement principles apply to the ACPA, as courts have recognized

5    (see below). In fact, every court that has reviewed this issue has concluded that a

6    claim for contributory cybersquatting exists.   Moreover, these courts have

7    provided a simple framework for analyzing contributory cybersquatting claims.

8        The ACPA's legislative history lends additional support to this conclusion,

9    as does the fact that there is also contributory liability for false advertising, a

10   creature of statute codified into the same section of the Lanham Act as is the

11   ACPA. *See*, 15 U.S.C. § 1125.

12   **III.   ARGUMENT**

13       **A.    There Is a Claim for Contributory Cybersquatting As the**

14            **Defendants' Own Authorities Confirm.**

15       Defendants cannot overcome the overwhelming fact that every court that

16   has reviewed whether a claim for contributory cybersquatting exists, has clearly

17   recognized that it does.  Defendants are simply unable to distinguish the current

18   case from the precedents.[3]   Moreover, even if Defendants were able to

19   persuasively distinguish the current case from the precedents, the underlying

20   policy of the ACPA still compels the conclusion that claims for contributory

21   cybersquatting must stand.

22       Defendants point to the *Ford Motor Co.* case, and incorrectly state that "the

23   court did not hold that the claim [of contributory cybersquatting] exists." Motion

24   to Dismiss, pg. 11; *Ford Motor Co. v. GreatDomains.com, Inc.*, 177 F. Supp. 2d

25   635 (E.D. Mich. 2001).   In fact, contrary to Defendants' assertion, the *Ford*

26   *Motor Co.* court found that contributory liability exists and would be present if

27   _____

28   [3] Defendants instead appear to simply criticize the prior courts analysis and/or
     ruling.

the "cyber-landlord" knew or should have known its customers were registering domain names for "no legitimate reason." *Ford Motor Co.*, 177 F. Supp. 2d at 647. The *Ford Motor Co.* court then proceeded to apply the principles pertinent to service providers. *See id.* at 646-47.

Defendants point to *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092 (C.D. Cal. 2009) and claim that "the court denied a motion to dismiss a claim of contributory cybersquatting without carefully evaluating whether the cause of action existed." Motion to Dismiss, pg. 11.   In fact, contrary to Defendants' assertion, the *Solid Host* court not only recognized the existence of a contributory cybersquatting claim—refusing to dismiss it—but correctly analyzed it as a species of contributory trademark infringement. *Solid Host*, 652 F. Supp. 2d at 1112. The *Solid Host* court explained that contributory trademark infringement occurs "when the defendant ... supplies a product to a third party with actual or constructive knowledge that the product is being used to infringe" the mark. *Id.* (quoting *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 983 (9th Cir. 1999) (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 853-54 (1982), the leading modern case defining contributory trademark infringement liability)). Under this standard, the *Solid Host* court found that when the alleged infringer supplies a service, rather than a product, it must "consider the extent of control exercised by the defendant over the third party's means of infringement." *Id.* (citations omitted). *Solid Host* went on to apply the "extent of control" theory for contributory cybersquatting based on the facts of the case. *Solid Host*, 652 F. Supp. 2d at 1112.

Lastly, in *Microsoft Corp.*,[4] the court plainly and succinctly explained that, "[t]hese two decisions [*Solid Host* and *Ford Motor Co.*], along with the case at

_____

[4] As discussed above, in *Microsoft Corp.*, Defendants' counsel unsuccessfully moved to dismiss a contributory cybersquatting claim raising essentially the same arguments now raised in Defendants' Motion to Dismiss.

hand, reveal the relevance of the cause of action for contributory cybersquatting. Moreover, the *Ford* decision has provided a simple framework that addresses the ACPA's additional element requiring bad faith." *Microsoft Corp.,* 2011 U.S. Dist. LEXIS 2995, at *5.

Defendants have offered no persuasive grounds why each of the prior courts' opinions, that a claim for contributory cybersquatting exists, should be ignored. Instead, the courts' opinions in *Solid Host*, *Ford Motor Co.,* and *Microsoft Corp.* provide a consistent and correct analysis that claims for contributory cybersquatting may stand.

**B.** **Because the Cybersquatting Tort Is a Statutory Extension of Trademark Infringement to a New Factual Context, Contributory Liability Applies and Derives Its Elements from Contributory Trademark Infringement.**

Basic principles of statutory analysis support that a contributory cybersquatting claim exists, and that *Solid Host*, *Ford Motor Co.,* and *Microsoft Corp.* were correct in so holding. As an initial matter, the Defendants' argument, that ACPA does not expressly provide for contributory liability, *see* Motion to Dismiss at pgs. 4-7, does not answer the question of whether the common law background against which the statute was enacted creates contributory liability. Rather, it invites that inquiry. The basic principle of statutory analysis is that "Congress does not write upon a clean slate. In order to abrogate a common law principle, the statute must 'speak directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (citations omitted); *see Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules") (citation omitted). Moreover, the Lanham Act, of which Congress made the ACPA a part, was enacted to "codify and unify the common law of

1    unfair competition and trademark protection." *Inwood Labs.*, 456 U.S. at 861

2    (White, J., concurring)). Because the ACPA is merely an extension of trademark

3    infringement liability under the Lanham Act to a new factual context – rather than

4    a new tort with a different gravamen – the statute would have to "speak directly"

5    to prevent application of the common-law principle of contributory liability. It

6    does not.

7         The statutory language and the legislative history confirm that

8    cybersquatting is a form of trademark infringement. The ACPA provides that a

9    violation occurs if someone, with bad faith intent to profit from the mark,

10   "registers, traffics in, or uses a domain name that – in the case of a mark that is

11   distinctive at the time of registration of the domain name – is ***identical or***

12   ***confusingly similar to that mark***." 15 U.S.C. § 1125(d)(1)(A) (likewise

13   providing protection for distinctive marks)(emphasis added). The essence of the

14   wrongful act – using someone else's mark to create public confusion as to the

15   source of a good or service in order to profit from the mark owner's goodwill in

16   its marks – is identical to trademark infringement. The same legislative history

17   quoted by the Defendants characterizes the ACPA as "provid[ing] an explicit

18   trademark remedy for cybersquatting" and describes the statute's "substantive

19   cause of action" as "based in trademark law," and as "fill[ing] in the gaps and

20   uncertainties of current trademark law with respect to cybersquatting."

21   106 S. Rpt. 140 (1999), pgs. 10, 8.[5]

22        To support their argument that cybersquatting is a distinct and

23

24   _____

     [5] Defendants lodged in their Appendix of Legislative Materials (Doc. No. 20):
25   145 Cong. Rec. S10513-10520 (daily ed. Aug. 5, 1999); 145 Cong. Rec. S9744-
     9755 (daily ed. Jul. 29, 1999); and 106 S. Rpt. No. 140 (1999). The materials are
26   Exhibits 1-3, respectively, to Defendants' Appendix of Legislative Materials. For
     consistency, and as no page numbering is provided within these documents,
27   Plaintiffs' citations to these materials will use the page numbers from the versions
     Defendants lodged with the Court.
28

circumscribed claim, Defendants offer the Senate Report and the Congressional Record from August 5th and July 29th, 1999.  However, the Senate Report does not support their position. The "carefully and narrowly tailored" language neither refers to remedies available under the ACPA, *see* Motion to Dismiss, pg. 5, nor is a general exhortation to narrow construction. Rather, it specifically refers to how the bad-faith intent requirement spares the innocent actor, as is evident from reading the sentences preceding and following the one containing the quoted words. 106 S. Rpt. 140, pg. 10 ("The bill is carefully and narrowly tailored . . . to extend only to cases . . . [of] bad-faith intent . . . . Thus the bill does not extend to innocent domain name registrations. . . ."). This reflects no intention to limit contributory liability, which by definition involves knowing conduct in aid of a primary infringer.

Nor does the bad-faith intent requirement alter the essential character of the tort of contributory infringement, as this requirement is also consistent with longstanding trademark principles. "Bad faith intent" refers not to general bad faith, but simply to an "inten[t] to profit specifically from the goodwill associated with another's trademark." *Solid Host*, 652 F. Supp. 2d at 1109 (collecting cases and quoting *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 499 n.13 (2d Cir. 2000) ("We expressly note that 'bad faith [and] intent to profit' are terms of art in the ACPA and hence should not necessarily be equated with 'bad faith' in other contexts"). This limitation on liability under ACPA was included to protect registrations of domain names by persons "who seek to make lawful uses of others' marks, including for purposes such as comparative advertising, comment, criticism, parody, news reporting, fair use, etc." 106 S. Rpt. 140, pg. 11. Courts have recognized a very similar limitation on the scope of trademark infringement generally. *See, e.g., Yankee Publ'n Inc. v. News America Publ'n Inc.*, 809 F. Supp. 267, 276 (S.D.N.Y. 1992) (Lanham Act construed narrowly when, "rather than identification of product origin," "the unauthorized

use of the trademark is for the purpose of a communicative message . . . [such as] comedy, parody, allusion, criticism, news reporting, and commentary.") Thus, the express inclusion of this limitation in the statutory definition of cybersquatting does not render the latter a fundamentally different tort from trademark infringement.

Notably, federal courts have even extended contributory liability to false advertising, a Lanham Act claim that addresses a wrong that, unlike cybersquatting, is analytically distinct from trademark infringement. *See, e.g., Grant Airmass Corp. v. Gaymar Indus., Inc.*, 645 F. Supp. 1507, 1512 (S.D.N.Y. 1986) (party could be liable "as a contributory infringer under the Lanham Act" for providing false report that primary infringer used in its advertising campaign). This is all the more remarkable because false advertising in its present form – *i.e.*, as a claim distinct from passing off – did not exist at common law. CALLMANN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES (4th ed., upd. 2010), § 5:2; a copy of which is included as Exhibit 1 to Plaintiffs' Appendix Of Non-Reported Materials. It is a creature of modern statute, a part of the Lanham Act that could not have codified existing secondary liability case law—and yet it is subject to secondary liability. Congress enacted the ACPA into the same Lanham Act section, section 1125, as false advertising.

In *Microsoft Corp.*, the court noted that "[a] recent Ninth Circuit decision interprets the ACPA broadly, and therefore lends support to allowing claims for contributory cybersquatting." *Microsoft Corp.*, 2011 U.S. Dist. LEXIS 2995 at *8 (citing to *DSPT International v. Nahum,* 624 F.3d 1213 (9th Cir. Oct. 27, 2010)). In *DSPT International*, the Ninth Circuit concluded that while the paradigmatic harm that the ACPA was meant to eradicate is the practice of cybersquatters registering hundreds of domain names, the statute "is written more broadly than what may have been the political catalyst that got it passed," and is therefore intended to prevent such bad-faith use of a mark in a domain name. *DSPT*

*International,* 624 F.3d at 1219.

Applying   *DSPT International*, the *Microsoft Corp.* court found that the "defendants' alleged conduct falls squarely within the statute's goal of imposing liability on those who seek to profit in bad faith by means of registering, trafficking, or using domain names that contain identical or confusingly similar marks. "A defendant who [contributes to the cybersquatting by others] should not be able to escape liability by interpreting the statute so narrowly. The practice of instructing others on how to engage in cybersquatting runs counter to the purpose of the ACPA."). *Microsoft Corp.*, 2011 U.S. Dist. LEXIS 2995 at *9.  "As DSPT International makes clear, the ACPA should not be read so narrowly as to unduly constrain the protections the statute is meant to afford against cybersquatters." *Id.* Lastly, the *Microsoft Corp.* court relied on *Bob Jones Univ. v. United States,* 461 U.S. 574, 586 (1983) ("It is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute.").

Because of the nature of the cybersquatting tort, as an extension of trademark infringement, and the absence of ***any*** contrary indication in the statutory language, legislative history, or prior precedent, contributory liability applies. The contributory cybersquatting tort derives from contributory trademark infringement, modified to take into account the "bad faith intent" requirement, as *Solid Host*,  *Ford Motor Co.*, and *Microsoft Corp.* courts each recognized.

###   C.   Plaintiffs Have Properly Stated a Claim for Contributory Cybersquatting.

Plaintiffs have plainly pled a cause of action for contributory cybersquatting. It is well established that a third party can be held liable for another's infringement of a trademark if the third party "... continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement." *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc., 955*

1    *F.2d 1143, 1148 (7th Cir. 1992)* (quoting *Inwood Labs.,* 456 U.S. 844, 854).

2    Moreover, willful blindness is inexcusable under contributory infringement law,

3    *id. 955 F.2d at 1149* (citing *Louis Vuitton S.A. v. Lee, 875 F.2d 584, 590 (7th Cir.*

4    *1989)).*

5         "Where the defendant supplies the infringer with a service rather than a

6    product, however, courts 'consider the extent of control exercised by the

7    defendant over the third party's means of infringement' in analyzing whether a

8    claim for contributory infringement lies." *Solid Host*, 652 F. Supp. 2d at 1112

9    (quoting *Lockheed Martin*, 194 F.3d at 983).  *Solid Host*, and *Ford Motor Co.*

10   both looked to "the extent of control exercised by the defendant over the third

11   party's means of infringement." *Solid Host*, 652 F. Supp. 2d at 1112; *Ford Motor*

12   *Co.*, 177 F. Supp. 2d at 646.

13        In the present case, Plaintiffs' have properly alleged each of the elements

14   of cybersquatting.  For example, Plaintiffs allege that the 183 Infringing Domain

15   Names "are confusingly similar to Plaintiffs' Marks."   Complaint, ¶ 122.

16   Similarly, Plaintiffs allege that the 183 Infringing Domain Names "were

17   registered, trafficked in, or used the Infringing Domain Names in bad faith and

18   with a bad faith intent to profit from Plaintiffs' Marks." Complaint, ¶ 123.

19   Plaintiffs' Complaint also contains allegations regarding each of the factors for

20   determining whether the registration, use, or trafficking each of the 183 Infringing

21   Domain Names was with a bad faith intent to profit from Plaintiffs' Marks.

22   Complaint, ¶¶124-133.

23        Plaintiffs have also alleged that Defendants contributed to the registration

24   or use of the Infringing Domain Names. Complaint, ¶ 122.  Similarly, Plaintiffs

25   allege that "Defendants provide the Above.com Privacy Service in connection

26   with the registration or use of the Infringing Domain Names, and profit from the

27   Above.com Privacy Service," Complaint, ¶ 111; that "Defendants are able to

28   monitor the use of the Above.com Privacy Service," Complaint, ¶ 112; that

"Defendants had control over the Above.com Privacy Service," Complaint, ¶ 113; that "Defendants are aware that the Above.com Privacy Service is used by registrants who have registered, used or trafficked in domain names that infringe the rights of others, including Plaintiffs' rights," Complaint, ¶ 114; and that "Defendants continue to supply the Above.com Privacy Service with knowledge that the service is used by registrants to infringe the rights of others, including Plaintiffs' rights." Complaint, ¶ 115.  Similar allegations regarding Defendants' monetization service are also provided in the Complaint.  Complaint ¶¶ 116-120.

Not only have Plaintiffs plead the required elements for contributory cybersquatting, both the Complaint and the Exhibits to the Complaint provide ample details regarding each contributory cybersquatting element. For example, the massive scope of Defendants' cybersquatting activities, and the large number of UDRP complaints filed against Defendants' privacy service, both strongly support that Defendants had actual or constructive notice that its customers were using Defendants' services to cybersquat.

Exhibit 5 to the Complaint lists some 68 UDRP complaints filed against Defendants' privacy service (*e.g.*, Above.com Domain Privacy) for cybersquatting.[6] Additional research by Plaintiffs has discovered over 114 UDRP complaints filed against Defendants' privacy service. *See* Exhibit 2 to Plaintiffs' Appendix Of Non-Reported Materials.  Because UDRP dispute providers send notices of each UDRP complaint filed to both the domain name registrar and the listed registrant, Defendants would have received notice of each of the 114 UDRP complaints.

Similarly, Exhibit 6 to the Complaint details some of the thousands of

---

[6] Technically, the elements of the UDRP are slightly different from the elements of the ACPA. Both, however, take issue with the registration and/or use of a domain name that is identical or confusingly similar to a trademark, with either the bad faith (or bad faith intent to profit).

1
2
3
4
5

domain names that infringe famous trademarks.[7] Defendants provide their privacy service and their monetization service for many of these infringing domain names. It is simply inconceivable that, given the number of infringing domain names, that Defendants did not know that their services were being used to cybersquat.

6
7
8
9
10
11
12
13
14

After receiving 114 notices that their privacy service was being used to hide the true identity of the registrant, who was being accused of cybersquatting, and the sheer number of infringing domain names which used Defendants' privacy service and monetization service, Defendants cannot seriously argue that they do not meet the standard of "knowing or having reason to know" that their customers are using their services to cybersquat with "a bad faith intent to profit." *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d at 983 (requiring "actual or constructive knowledge"), citing *Inwood Labs*, 456 U.S. at 854 (a contributory infringers "knows or has reason to know" he is infringing).

15
16
17
18
19
20

Once evidence of a violation comes to the registrar's attention, it may be implicated as a contributory infringer if it fails to act. In *Ford Motor Co.*, the "exceptional circumstances" supporting contributory liability would be present if the "cyber-landlord" knew or should have known its customers were registering domain names for "no legitimate reason." *Ford Motor Co.,* 177 F. Supp. 2d at 647. This standard is plainly met here.

21
22
23
24
25

The Complaint also alleges, as discussed above, that "Defendants are able to monitor the use of the Above.com Privacy Service," Complaint, ¶ 112, and that "Defendants had control over the Above.com Privacy Service," Complaint, ¶ 113. *Solid Host*, 652 F. Supp. 2d at 1112 ("the extent of control exercised by the

26
27

[7] As discussed above, this was only a representative list which included one famous mark for each letter of the alphabet. And the list was ***many*** pages long (single-spaced, with dual columns).

28

defendant over the third party's means of infringement"); *see Ford Motor*, 177 F. Supp. 2d at 646.  One recent UDRP decision also illustrates that Defendants exercise control over the Above.com privacy service.[8] *Association des Centres Distributeurs E.Leclerc - A.C.D Lec v. Ho Nim / Above.com Domain Privacy*, D2011-0070, (WIPO Mar. 14, 2011) (Admn. proceeding regarding www-leclerc.com). A copy of the decision is attached as Exhibit 3 to Plaintiffs' Appendix Of Non-Reported Materials. In its opinion, the Panel appointed by the World Intellectual Property Organization found that the registrar for the subject domain name, Above.com Pty Ltd, improperly changed the registrant of the domain name (the privacy service Defendants provide hides the identify of the actual registrant, and lists Defendants' privacy service instead) during the pendency of a UDRP proceeding, in violation of the policy.  Specifically, the Panel found:

> The Panel also notes that the registrant of the disputed domain name was changed subsequent to the registrar verification. The change of registrant could not have been done without the Registrar's assistance. Further the Registrar has not provided any satisfactory reply to the Center's queries about such changes to the disputed domain name, which was supposed to be in a locked status. Changes to the domain name registration in this manner would appear to be in this Panel's view in contravention to the Policy. It also gives rise to suspicion about the Registrar's motives in facilitating changes being made to the disputed domain name registration.

*Association des Centres Distributeurs,* D2011-0070.

---

[8] This decision was issued shortly before Plaintiffs filed their case against Defendants, and was not listed in Exhibit 5 to the Complaint.

D.     **Defendants Policy Arguments Ignore The Reasons For Contributory Liability.**

Defendants, incorrectly state that "[u]nder Verizon's theory of contributory liability, Above.com would be liable even though it is a third party, and even though it does not have bad faith intent." Motion to Dismiss at pg. 7.  Plaintiffs seek nothing more than what the law already provides; that a third party who "... continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement" be liable for contributing to the infringement.  *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc., 955 F.2d at 1148.*  To permit otherwise, would encourage companies to turn a blind eye to cybersquatting by its customers. As the court in *Louis Vuitton* explained, "willful blindness is inexcusable under contributory infringement law." *Louis Vuitton S.A.*, *875 F.2d 584, 590.*

Plaintiffs do not complain that Defendants offer their services, nor do Plaintiffs believe that Defendants need "ascertain its customers' intent concerning every domain name." Motion to Dismiss, pg. 7.  Instead, Plaintiffs complain that Defendants, who obviously have control over the services, and continue to provide the services when they knew or should have known that those services are being used to cybersquat on Plaintiffs VERIZON marks.  *Ford Motor Co.*, 177 F. Supp. 2d at 647.

IV.     **CONCLUSION**

For the reasons set forth above, the Court should deny the Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) filed by Defendants.

1   Dated:  June 27, 2011                Respectfully submitted,

2                                        CHRISTIE, PARKER & HALE, LLP

3                                        By /s/David J. Steele
                                         _____
4                                        David J. Steele
                                         Howard A. Kroll

5                                        Attorneys for Plaintiffs
                                         VERIZON CALIFORNIA INC.
6                                        VERIZON TRADEMARK SERVICES LLC
                                         VERIZON LICENSING COMPANY

7

8   LLB PAS1121463.3-*-06/27/11 8:18 PM

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CHRISTIE, PARKER & HALE, LLP