UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERIZON CALIFORNIA, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> ABOVE.COM PTY LTD., TRELLIAN LIMITED; TRELLIAN LLC; DAVID WARMUZ; RENE WARMUZ a/k/a REN WARMUZ; AND DOES 1—10, <br><br> Defendants. | CASE NO.: CV 11-0973 ABC (CWx) <br><br> ORDER RE: DEFENDANTS' MOTION TO DISMISS SECOND CAUSE OF ACTION |

Pending before the Court is Defendants Above.com Pty, Ltd., Trellian Limited, Trellian, LLC and David and Rene Warmuz's ("Defendants'") Motion for Partial Dismissal under Federal Rule of Civil Procedure 12(b)(6), filed on May 23, 2011.  (Docket No. 19.) Plaintiffs Verizon California, Inc., Verizon Trademark Services, LLC, and Verizon Licensing Co. ("Verizon") opposed on June 27, 2011 and Defendants replied on July 5, 2011.  The Court finds this matter appropriate for resolution without oral argument and will not hear argument at the July 18, 2011 scheduling conference, which remains on calendar.  Fed. R. Civ. P. 78; Local Rule 7-15.  For the reasons below, the motion is DENIED.

**FACTUAL ALLEGATIONS**

Verizon alleges that Defendants are serial cybersquatters who conduct a massive cybersquatting operation involving hundreds of thousands of domain names that are confusingly similar to well-known trademarks, such as Barbie, Cartoon Network, Disney, Fisher Price, Toyota, Walmart, etc., and Verizon's own trademarks. (Compl., Ex. 6 (representative list of domain names alleged to infringe trademarks).) Defendants have registered many of these domain names for their own use, on the theory that the domain names — many of which are variants or typographical errors of well-known marks[1] — lure users searching for the genuine trademarked goods and services to click on advertising links on Defendants' websites (often directly competing with the goods and services of the trademark holder). Defendants, in turn, are paid each time an advertisement is displayed or a link is clicked on that domain name. Verizon alleges that at least 183 domain names infringe its famous trademarks. (Compl. ¶ 78.)

Defendants operate a domain registrar called Above.com Pty Ltd. that registers domain names for Defendants and Defendants' customers. Defendants also operate shell companies, false identities, and "privacy services," such as Above.com Domain Privacy, Domain Parking Limited, and Transure Enterprise Ltd., to conceal their identities and involvement in the domain names at issue. These false identities and privacy services are often listed as the registrant for the domain names in the WHOIS records for those sites, rather than the true

---

[1] For instance, Defendants have registered "www.ver9izon.com," "www.veri9zon.com," and "www.verizo9n.com." On a standard computer keyboard, the "9" key straddles the "i" and "o" keys; thus, a consumer might mistakenly hit the "9" while typing in "www.verizon.com" and inadvertently visit one of Defendants' sites, rather than Verizon's.

registrants.  According to Verizon's initial research, Defendants have been subject to at least 68 Uniform Domain Name Dispute Resolution Policy ("UDRP") complaints related to their privacy service (Compl. ¶ 67, Ex. 5); since filing the Complaint, Verizon has uncovered another 114 complaints over Defendants' privacy service (Pls. App'x Non-Reported Materials, Ex. 2.)  Verizon alleges that Defendants received notice of these complaints, although Verizon does not indicate that any of these complaints involved Verizon's marks at issue here.

Defendants also offer a "monetization service" operating under the name Trellian LTD, commonly referred to as "Domain Parking Manager," which is intended to maximize the money paid to domain name owners who host webpages which contain advertisements.

Verizon has alleged two claims for cybersquatting pursuant to Anti-Cybersquatting Consumer Protection Act (the "ACPA"), 15 U.S.C. § 1125(d).  The first claim is for "direct" cybersquatting, which is not at issue here.  The second claim is for "contributory" cybersquatting, which rests on the allegations that Defendants "contributed to the registration or use" of the infringing domain names through use of the privacy and monetization services.  According to the complaint, Defendants had control over these services and could monitor them, and they knew that registrants were using the domain names in violation of the ACPA, but they nevertheless allowed the violations to continue. (Compl. ¶¶ 109–120.)

Defendants move to dismiss only the contributory cybersquatting claim on the grounds that no such cause of action exists under the ACPA and, even if it did, the complaint does not sufficiently allege facts to create liability for contributory cybersquatting.

**LEGAL STANDARD**

A complaint survives a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) if it contains a "short and plain statement of the claim showing that the pleader is entitled to relief," which does not require "detailed factual allegations," but it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, __ U.S. __, __, 129 S. Ct. 1937, 1949 (2009). A claim must be "plausible on its face," which means that the Court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.; see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In other words, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotations and alterations omitted). Allegations of fact are taken as true and construed in the light most favorable to the nonmoving party. See Newdow v. Lefevre, 598 F.3d 638, 642 (9th Cir. 2010), cert. denied, __ U.S. __, __ S. Ct. __, 2011 WL 89350 (Mar. 7, 2011). In doing so, the Court may not consider material beyond the pleadings, but may consider judicially noticeable documents, documents attached to the complaint, or documents to which the complaint refers extensively or which form the basis of the plaintiff's claims in the complaint. See United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).

**DISCUSSION**

Under the ACPA, cybersquatting "'occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain

4

name to divert business from the trademark holder to the domain name holder.'" <u>Bosley Med. Inst., Inc. v. Kremer</u>, 403 F.3d 672, 680 (9th Cir. 2005).  The ACPA authorizes a trademark owner to bring a civil suit against any person who:  "(i) has a bad faith intent to profit from that mark . . . ; and (ii) registers, traffics in, or uses a domain name that . . . is identical or confusingly similar to or [in certain cases] dilutive of that mark . . . ."  15 U.S.C. § 1125(d)(1)(A).

### A.   Availability of Contributory Liability

Verizon alleges that Defendants are liable under the ACPA not only for directly violating the statute — that is, by "register[ing], traffic[ing] in, or us[ing] a domain name" confusingly similar to Verizon's trademarks — but also for allowing cybersquatters to do the same through the use of the privacy and monetization services.  The three courts to have addressed whether a claim for contributory liability exists under the ACPA have all either suggested or held that it does.  <u>See</u> <u>Microsoft Corp. v. Shah</u>, Case No. C10-0653 RSM, 2011 WL 108954, at *1-3 (W.D. Wash. Jan. 12, 2011); <u>Solid Host, NL v. Namecheap, Inc.</u>, 652 F. Supp. 2d 1092, 1111-17 (C.D. Cal. 2009); <u>Ford Motor Co. v. Greatdomains.com, Inc.</u>, 177 F. Supp. 2d 635, 646-47 (E.D. Mich. 2001).  This Court agrees.

The first step in determining whether the ACPA could support a contributory cybersquatting claim is to look to the statute's text.  <u>Hawaii v. Office of Hawaiian Affairs</u>, __ U.S. __, __, 129 S. Ct. 1436, 1444 (2009).  The ACPA neither expressly recognizes nor expressly prohibits a claim for contributory cybersquatting; it simply creates a cause of action against any "person" who meets the statutory requirements for liability.  § 1125(d)(1)(A).

However, when a statute "invade[s] the common law," it is presumed to "favor[] the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." United States v. Texas, 507 U.S. 529, 534 (1993). "In such cases, Congress does not write upon a clean slate. . . . In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." Id. Similarly, "when Congress creates a tort action, it legislates against the legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." Meyer v. Holley, 537 U.S. 280, 285 (2003).

Before the ACPA was passed in 1999, a well-established theory of contributory liability for trademark infringement existed under the Lanham Act. See, e.g., Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 854 (1982) ("[I]f a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit."). "Contributory trademark infringement is a judicially created doctrine that derives from the common law of torts." Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 104 (2d Cir. 2010); see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005) (stating in the context of the Copyright Act that, "[a]lthough '[t]he Copyright Act does not expressly render anyone liable for infringement committed by another,' . . . these doctrines of secondary liability emerged from common law principles and are well established in the law.").

Against this backdrop, Congress codified the ACPA as an extension of trademark law because the problems created by cybersquatting did not fit neatly into traditional trademark principles. See S. Rep. 106-140, at 4 (1999) (noting that one purpose of the law was to "provide clarity in the law for trademark owners" in the area of cybersquatting); id. at 7 (noting the "uncertainty as to the trademark law's application to the Internet," which has left trademark owners "without adequate and effective judicial remedies"); 145 Cong. Rec. 9744, 9750 (1999) (comments from Sen. Hatch that "cybersquatters are becoming more sophisticated and more creative in evading what good case law has developed under the [trademark] dilution statute"). Indeed, the Senate Report on the ACPA indicates that the statute amends the Trademark Act "to provide an explicit trademark remedy for cybersquatting." S. Rep. 106-140, at 12.[2]

The Court must presume that Congress was aware of the standard common law principles of contributory trademark infringement when it enacted the ACPA. Although the ACPA varies somewhat from traditional trademark law — most notably with the addition of a bad faith intent requirement — it was still intended primarily to extend trademark law to this new context. Without an expressed legislative desire to the contrary, the ACPA carried forward traditional common law principles attendant to trademark rights. Thus, the statutory scheme of the

---

[2] Defendants cite another comment in the legislative history to argue that they could not be subject to liability for "using" a domain name because their privacy service simply provides "directory publishing" and their monetization service involves only the placement of "hypertext links, advertising, or providing search results." (Mot. 7.) See 145 Cong. Rec. 10513, 10516 (1999) (comment by Sen. Hatch that "uses" were not intended to include "uses by others, such as in hypertext links, directory publishing, or search engines"). Defendants offer nothing to support these statements.

ACPA, enacted against the settled common law theories of contributory liability in the trademark context, does not foreclose contributory liability for cybersquatting.[3]

This conclusion is consistent with the decisions in Microsoft, Solid Host, and Ford. In Ford, for example, a service that auctioned domain names was accused of contributing to cybersquatters' violation of the ACPA by allowing and facilitating the sales and auctioning of infringing domain names. 177 F. Supp. 2d at 646. Although not engaging in an exhaustive analysis, the court analogized to the "flea market" concept, whereby a defendant could be contributorily liable for trademark infringement when the defendant "exercises 'direct control and monitoring' over its vendors" and "'suppl[ies] the necessary marketplace' for the sale of infringing products." Id. (quoting Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 984-85 (9th Cir. 1996)). The court recognized that this analogy was not a perfect fit under the ACPA because the statute also requires bad faith, but nevertheless suggested that applying traditional

---

[3] Relying on a recent Ninth Circuit case under the Digital Millennium Copyright Act ("DMCA"), Defendants argue that the ACPA created an entirely new cause of action separate from trademark infringement, so a theory of contributory liability does not exist under the statute. See MDY Indus. v. Blizzard Entm't, Inc., 629 F.3d 928 (9th Cir. 2011). Defendants' major premise is correct: the ACPA created a new cause of action in the sense that the elements vary from traditional trademark infringement. However, their minor premise is flawed because MDY did not address, let alone preclude, the existence of contributory liability here. In the portion of MDY cited by Defendants, the court merely noted in passing that the Copyright Office suggested that one portion of the DMCA created a new right separate from copyright infringement that did not carry with it a fair use defense. Id. at 948 n.10; see also id. at 950 & n.12 (noting that the court was not deciding the scope of the new right). The Court did not discuss contributory liability or the ACPA, and it certainly did not hold that when Congress enacted the ACPA, it intended to write on an entirely blank slate. Indeed, the contrary appears to be true.

contributory liability principles under a "heightened" standard could be appropriate:

> For example, it would be insufficient that an entity such as Great Domains were merely aware that domain names identical or similar to protected marks were being sold over its website. Rather, because legitimate uses of others['] marks are protected under the ACPA, a plaintiff would have to demonstrate that the "cyber-landlord" knew or should have known that its vendors had no legitimate reason for having registered the disputed domain names in the first place. Because an entity such as Great Domains generally could not be expected to ascertain the good or bad faith intent of its vendors, contributory liability would apply, if at all, in only exceptional circumstances.

Id. at 647. The court then found that no such circumstances existed in that case, so the defendant could not have been held contributorily liable for cybersquatting. Id.

The court in Solid Host took Ford a step further to state that "[c]ourts have applied [a contributory liability] theory to cybersquatting claims under the ACPA." Solid Host, 652 F. Supp. 2d at 1112. That court then identified and applied the contributory liability standard to determine that the plaintiff had stated a claim for contributory liability under the ACPA by alleging that the defendant had provided an anonymity service that the direct cybersquatter had used to "steal" the domain name at issue and hold it for ransom. Id. at 1112, 1115–17.

Similarly, the court in Microsoft relied on both Solid Host and Ford to find that contributory liability could lie under the ACPA. 2011 WL 108954, at *2–3. The court explained that the "well-established" doctrine of contributory liability is "naturally suited" to the "tort-like causes of action" of both trademark infringement and cybersquatting. Id. at *3. The court also relied on the Ninth Circuit's comment in DSPT Int'l, Inc. v. Nahum, 624 F.3d 1213, 1219

(9th Cir. 2010) that the ACPA "is written more broadly than what may have been the political catalyst that got it passed."  The court ultimately held that the plaintiff had stated a claim for contributory liability in light of the defendant's instruction to third parties on how to capitalize on famous trademarks.  <u>Microsoft</u>, 2011 WL 108954, at *3.

Defendants argue that contributory liability cannot exist under the ACPA because the scope of liability under the statute was intended to be narrow, as evidenced by the requirement that bad faith exist before liability will attach.  <u>See, e.g.</u>, S. Rep. 106-140, at *12 ("The bill is carefully and narrowly tailored, however, to extend only to cases where the plaintiff can demonstrate that the defendant registered, trafficked in, or used the offending domain name with bad-faith intent to profit from the goodwill of a mark belonging to someone else.").  Again, however, the Ninth Circuit has recognized that the language of the ACPA is broader than the reasons for its adoption.  <u>See</u> <u>Nahum</u>, 624 F.3d at 1219.  And even if the ACPA's scope is indeed narrow as a general matter, contributory liability, as will be discussed below, is sufficiently cabined by an "exceptional circumstances" requirement to prevent the imposition of liability in contravention of the intent of the statute.

Defendants are also concerned that imposing contributory liability for routine domain name registration would require the registrar to police hundreds of thousands and perhaps millions of registered domain names to determine whether registrants are registering infringing domain names in bad faith.  Defendants also worry that innocent registrars who provide legitimate privacy and monetization services could be punished if contributory liability is

10

recognized. Yet, as Solid Host noted, these concerns are alleviated by finding contributory liability only when "exceptional circumstances" are present beyond simply registering infringing domain names or providing privacy and monetization services. See Solid Host, 652 F. Supp. 2d at 1116 ("Because of this, and because a defendant in NameCheap's position may not easily be able to ascertain a customer's good or bad faith, the court agrees with the Ford Motor Co. court that 'exceptional circumstances' must be shown to prove the degree of knowledge required to impose contributory liability for cybersquatting.").[4]

Thus, in light of the text of the ACPA, the backdrop of the statute's adoption, and the uniform case law, the Court concludes that contributory liability exists under the ACPA.

**B. Sufficiency of the Complaint**

Recognizing a contributory liability theory is only the first step in the analysis; the Court must now determine whether the cause of action has been sufficiently pled in the complaint. In the context of infringing products, contributory trademark infringement exists when "the defendant either intentionally induces a third party to infringe the plaintiff's mark or supplies a product to a third party with actual or constructive knowledge that the product is being used to infringe the service mark." Lockheed Martin, 194 F.3d at 983. Because contributory liability for a domain name registrar implicates

---

[4] Defendants argue that the Court should not recognize contributory liability under the ACPA because the Court should not infer a new private right of action under the ACPA and adequate alternative remedies exist. However, the cases cited by Defendants arose in vastly different circumstances than here, where the issue is whether a tort-like statute such as the ACPA precludes an existing common law theory of contributory liability. That issue is more aptly governed by the Texas and Holley decisions cited supra.

a service, and not a product, the Court must consider "the extent of control exercised by the defendant over the third party's means of infringement." Id. at 984.  Thus, under the "extent of control" theory at issue here, "[f]or liability to attach, there must be '[d]irect control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark." Perfect 10, Inc. v. Visa Int'l Serv. Ass'n, 494 F.3d 788, 807 (9th Cir. 2007) (quoting Lockheed Martin, 194 F.3d at 984; alteration in original); see also Solid Host, 652 F. Supp. 2d at 1112.  In the specific context of the ACPA, the Court agrees with Ford and Solid Host that, to state a claim for contributory liability under the ACPA, a defendant must have known or have had reason to know that the direct cybersquatter was acting in bad faith, which can be demonstrated by the existence of "exceptional circumstances." Ford, 177 F. Supp. 2d at 647; see also Solid Host, 652 F. Supp. 2d at 1116.

   Verizon's complaint sufficiently alleges all of the elements to impose contributory liability on Defendants under the ACPA.  First, there is no dispute that direct liability has been properly alleged for 183 identified infringing domain names.  Second, Verizon has alleged myriad facts that together plausibly demonstrate the exceptional circumstances necessary to show that Defendants knew or should have known that registrants were violating the ACPA in bad faith.  For example, Verizon alleges that Defendants controlled and monitored the privacy and monetization services, so they were aware that those services were being used for cybersquatting on Verizon's famous marks and did nothing about it.  Indeed, Verizon alleges that Defendants profited from the monetization service, and it is

reasonable to infer that Defendants were aware of and monitored these revenue streams.

Moreover, the vast scope of the contributory cybersquatting aided by Defendants' privacy and monetization services reasonably suggests that Defendants should have been aware that those services were being used for cybersquatting on Verizon's famous marks. The domain names at issue are among potentially thousands of domain names that potentially infringe many famous trademarks, and Defendants' privacy service has been subject to nearly 200 UDRP complaints of cybersquatting. Coupled with the allegations that Defendants controlled and monitored cybersquatters' use of the privacy and monetization services to cybersquat on Verizon's famous marks, this widespread pattern of cybersquatting could plausibly create the "exceptional circumstances" to support contributory liability here.

Notwithstanding Defendants' contrary arguments, this conclusion fully comports with the existing case law. For example, in <u>Lockheed Martin</u>, the Ninth Circuit refused to impose contributory liability for trademark infringement on a registrar that provided only a "rote translation service" that did "not entail the kind of direct control and monitoring required to justify" contributory liability. 194 F.3d at 985. By contrast, Verizon has alleged here that Defendants do not simply provide "rote" registration services; they provide privacy and monetization services, which they control and monitor. In addition, Defendants have been repeatedly notified that registrants have been using those services for cybersquatting. In <u>Ford</u>, the court found no exceptional circumstances to impose contributory liability on a domain-name auction site, whereas in this case, the privacy and monetization services and the scale of the cybersquatting create a

13

circumstance that could justify the exceptional circumstances to impose contributory liability.

This case is more like Solid Host and Miscrosoft, both of which found that exceptional circumstances existed to support contributory liability. In Solid Host, for instance, exceptional circumstances existed for a claim that a domain registrar should have known that a domain name had been stolen. 652 F. Supp. 2d at 1116. Likewise, in Microsoft, exceptional circumstances existed because the defendants had been teaching others how to capitalize on the plaintiff's famous marks. 2011 WL 108954, at *3. Similarly here, Verizon has alleged that Defendants monitored and controlled the privacy and monetization services and must have been well aware of the broad scope of cybersquatting on Verizon's and many others' famous marks, which is an exceptional circumstance sufficient to impose contributory liability. Although Defendants argue that Solid Host and Microsoft involved knowledge that cybersquatting was occurring as to the plaintiff's trademarks specifically, whereas here, Verizon has merely alleged a scheme of cybersquatting on many different marks, the factual allegations discussed above support the inference that Defendants should have known that cybersquatting was occurring as to Verizon's famous marks specifically.

## CONCLUSION

The Court finds that a contributory liability claim exists under the ACPA and Verizon has sufficiently alleged a claim on that basis. Therefore, Defendants' motion to dismiss is DENIED.

**IT IS SO ORDERED.**

**DATED: July 13, 2011**  _____
　　　　　　　　　　　　　　　　AUDREY B. COLLINS
　　　　　　　　　　　　　　　　CHIEF UNITED STATES DISTRICT JUDGE

14